# When a Prior Conviction Qualifies as a "Misdemeanor Crime of Domestic Violence"

A "misdemeanor crime of domestic violence" under 18 U.S.C. § 922(g)(9) is limited to those offenses of which the use or attempted use of physical force or the threatened use of a deadly weapon is an element—that is, a factual predicate specified by law and required to support a conviction.

Where the legal definition of the crime at issue contains a disjunctive element (which requires proof of only one of multiple specified factual predicates), only one subpart of which requires the use or attempted use of physical force or the threatened use of a deadly weapon, application of the prohibition in section 922(g)(9) will turn on whether the factfinder found that the subpart meeting the "misdemeanor crime of domestic violence" definition had been proved (or whether the defendant pleaded guilty to that subpart). The answer to that question may be gleaned from the record of conviction or the supporting record of proceedings in the court of conviction. Police reports cannot answer that question.

The above interpretations also govern background checks by the Federal Bureau of Investigation for firearms transfers under the National Instant Background Check System, but additional materials, including police reports, may be relied upon by the NICS for certain limited purposes.

May 17, 2007

MEMORANDUM OPINION FOR THE CHIEF COUNSEL
BUREAU OF ALCOHOL, TOBACCO, FIREARMS, AND EXPLOSIVES

Federal law prohibits persons who have been "convicted in any court of a misdemeanor crime of domestic violence" from possessing or receiving a firearm in certain circumstances. 18 U.S.C. § 922(g)(9) (2000). The law defines a "misdemeanor crime of domestic violence" to include only "an offense" that "has, as an element, the use or attempted use of physical force, or the threatened use of a deadly weapon." *Id.* § 921(a)(33)(A)(ii). The Bureau of Alcohol, Tobacco, Firearms, and Explosives ("ATF") enforces this prohibition by, among other things, denying applications for federal firearms licenses and seizing firearms for forfeiture. *See id.* §§ 923(d)(1)(B) & 924(d). You have asked us to address when a prior conviction qualifies as a "misdemeanor crime of domestic violence."

We conclude, first, that a "misdemeanor crime of domestic violence" is limited to those offenses of which the use or attempted use of physical force or the threatened use of a deadly weapon is an *element*—that is, a factual predicate specified by law and required to support a conviction. Second, where the legal definition of the crime at issue contains a disjunctive element (which requires proof of only one of multiple specified factual predicates), only one subpart of which requires the use or attempted use of physical force or the threatened use of a deadly weapon, application of the prohibition in section 922(g)(9) will turn on whether the factfinder found that the subpart meeting the "misdemeanor crime of domestic violence" definition had been proved (or whether the defendant pleaded guilty to that subpart). The answer to that question may be gleaned from the record of conviction or the supporting record of proceedings in the court of conviction.

123

Police reports cannot answer that question. Finally, the above interpretations also govern background checks by the Federal Bureau of Investigation ("FBI") for firearms transfers under the National Instant Background Check System ("NICS"), but additional materials, including police reports, may be relied upon by the NICS for certain limited purposes.

## I.

The "misdemeanor crime of domestic violence" firearms prohibition is the product of two provisions in title 18 of the U.S. Code. Section 922(g) provides:

> It shall be unlawful for any person—
>
> . . .
>
> (9) who has been *convicted in any court of a misdemeanor crime of domestic violence*, to ship or transport in interstate or foreign commerce, or possess in or affecting commerce, any firearm or ammunition; or to receive any firearm or ammunition which has been shipped or transported in interstate or foreign commerce.

(Emphasis added.) Section 921(a)(33)(A) in turn defines a "misdemeanor crime of domestic violence" as:

> an *offense* that—
>
> (i) is a misdemeanor under Federal or State law; and
>
> (ii) *has, as an element, the use or attempted use of physical force, or the threatened use of a deadly weapon*, committed by a current or former spouse, parent, or guardian of the victim, by a person with whom the victim shares a child in common, by a person who is cohabiting with or has cohabited with the victim as a spouse, parent, or guardian, or by a person similarly situated to a spouse, parent, or guardian of the victim.

(Emphases added.)

Putting these two provisions together, the prohibition applies, as relevant here, only to a person who (1) has been "convicted" in court, (2) of an "offense," (3) that "has, as an element, the use or attempted use of physical force, or the threatened use of a deadly weapon."[1] The application of this prohibition, then, depends upon the "element[s]" of the particular "offense" of which the person was

---

[1] You have not asked about, and we do not address, the domestic-relationship requirement or the requirement that the offense be a misdemeanor.

"convicted." That is, the prohibition turns on the *legal definition* of the predicate offense of conviction, not on the *actual conduct* that may have led to the conviction for that offense. One must determine what the convicting court found, not what the defendant did.

This conclusion follows from a proper understanding of the key statutory term "element." Elements are the factual predicates of an offense that are specified by law and must be proved to secure a conviction. *See, e.g.*, *Patterson v. New York*, 432 U.S. 197, 210 (1970); *Richardson v. United States*, 526 U.S. 813, 817 (1999); *see also Black's Law Dictionary* 538 (7th ed. 1999) (defining "element" as "[a] constituent part of a claim that must be proved for the claim to succeed"). If conviction of a given offense can be secured without proof of a certain fact, then that fact is not an element of that offense. As the en banc Fifth Circuit has explained: "If any set of facts would support a conviction without proof of that component, then the component most decidedly is not an element—implicit or explicit—of the crime." *United States v. Vargas-Duran*, 356 F.3d 598, 605 (2004); *see also Singh v. Ashcroft*, 386 F.3d 1228, 1231 (9th Cir. 2004) ("An element of a crime is a constituent part of the offense which must be proved by the prosecution *in every case* to sustain a conviction under a given statute.") (internal quotation marks omitted); *United States v. Fulford*, 267 F.3d 1241, 1250 (11th Cir. 2001) ("At common law, the word 'element' refers to a constituent part[] of a crime which must be proved by the prosecution to sustain a conviction.") (internal quotation marks omitted); *United States v. Jones*, 235 F.3d 342, 347 (7th Cir. 2000) (holding that an assault and battery conviction did not qualify as a "crime of violence" under the Sentencing Guidelines because "actual, attempted, or threatened physical force is not a necessary element of the offense").

It is well established that language turning on the "elements" of a predicate "offense" of "convict[ion]" requires considering the legal definition of the offense of conviction. The Supreme Court, addressing a statute that, much like the "misdemeanor crime of domestic violence" definition, turns on whether a person has been convicted of a predicate "*offense* that has as an *element* the use, attempted use, or threatened use of physical force," 18 U.S.C. § 16(a) (2000) (emphases added), has recognized that such language "requires us to look to the elements . . . of the offense of conviction, rather than to the particular facts relating to petitioner's crime." *Leocal v. Ashcroft*, 543 U.S. 1, 7 (2004). The Eighth Circuit earlier took the same view in addressing the prohibition at issue here: "When statutory language dictates that predicate offenses contain enumerated elements, we must look only to the predicate offense rather than to the defendant's underlying acts to determine whether the required elements are present." *United States v. Smith*, 171 F.3d 617, 620 (8th Cir. 1999). *See also United States v. Griffith*, 455 F.3d 1339, 1341 (11th Cir. 2006) (application of section 921(a)(33)(A)(ii) "does not turn on the actual conduct underlying the conviction but on the elements of the state crime"); *Szucz-Toldy v. Gonzales*, 400 F.3d 978, 982 (7th Cir. 2005) (per curiam) (case involving statute at issue in *Leocal*, citing *Smith*, among other cases, for

proposition that "the particular method by which [the defendant] violated the . . . statute has no bearing whatever on whether one of the elements of that statute is the use or threatened use of force"); *United States v. Shelton*, 325 F.3d 553, 558 n.5 (5th Cir. 2003) ("[W]e look to the elements set forth in the statute—not the actual conduct to determine whether the offense qualifies as a crime of domestic violence."). Because an "element" is a part of an offense specified *by law*, the existence of the required element is determined by "a legal inquiry as opposed to a factual inquiry." *Fulford*, 267 F.3d at 1250 (internal quotation marks omitted). This inquiry involves, for statutory offenses, simply determining "the elements *set forth in the statute*." *Shelton*, 325 F.3d at 558 n.5 (emphasis added). For a common law crime, or a statutory crime stated in general terms that draw on the common law (for example, "battery"), the elements will be specified in the jurisdiction's case law, but will nevertheless still consist only of the predicate facts defined by law that must be proved in all cases to obtain a conviction. *See, e.g.*, *United States v. Melton*, 344 F.3d 1021, 1026 (9th Cir. 2003) ("Where, as here, the state crime is defined by specific and identifiable common law elements, rather than by a specific statute, the common law definition of a crime serves as a functional equivalent of a statutory definition."); *State v. Coomes*, 102 N.W.2d 454, 457 (Neb. 1960) (noting that state has no common law crimes but does "resort to common-law definitions where general terms are used to designate crime") (internal quotation marks omitted); *cf. Taylor v. United States*, 495 U.S. 575, 598 (1990) (holding that Congress, in using the word "burglary" in a statute, meant "the generic sense in which the term is now used in the criminal codes of most States," and summarizing the elements). Wherever the authoritative definition may be found, however (whether in a statute or case law), if the offense of conviction did not have, as an element, the use or attempted use of physical force or the threatened use of a deadly weapon, then the section 922(g)(9) prohibition does not apply, regardless of the actual conduct that may have provided the basis for the conviction. (Correspondingly, if such action *was* an element of the offense of conviction, there is no cause to consider whether the actual underlying conduct included such action.)

For example, a general criminal statute that prohibits disturbing the peace presumably could be violated by conduct that includes use of force, attempted force, or threatened use of a deadly weapon. But if the legal definition of the disturbing-the-peace offense does not include a requirement that such action be proved, then a conviction for that offense is not a conviction for an offense that has an element meeting the "misdemeanor crime of domestic violence" definition, regardless of whether the defendant actually used force or even whether the government proved conduct that included the use of force. The prohibition therefore does not apply in such a case. As the en banc Fifth Circuit explained in a similar context, if:

> an indictment charged a defendant with the crime of disturbing the peace . . . and also specified that he committed the crime "by throwing a bottle at the victim's head," . . . the prosecution might be required to prove that the defendant indeed engaged in that charged conduct, but throwing a bottle at someone is not an element of the disturbing-the-peace statute. . . . It is, rather, one means of violating the statute.

*United States v. Calderon-Peña*, 383 F.3d 254, 257 n.4 (5th Cir. 2004); *see id.* at 258 (distinguishing "the manner and means" of committing a crime, even if charged in the indictment to satisfy due process, from "an element of the offense"). Likewise, Nebraska's disturbing the peace statute provides simply that "[a]ny person who shall intentionally disturb the peace and quiet of any person, family, or neighborhood commits the offense of disturbing the peace." Neb. Rev. Stat. § 28-1322 (1977). The statute does not on its face contain elements meeting the requirements of the "misdemeanor crime of domestic violence" prohibition, and state courts have made clear that the statutory language encompasses a wide variety of conduct not limited to violence or the use of force. A person convicted under the Nebraska statute thus "could have committed the offense of disturbing the peace without the use of force." *Kneifl v. United States*, No. 8:02CV96, slip op. at 16 (D. Neb. Feb. 18, 2003); *see also id.* at 10 (discussing state court interpretations of state statute). Therefore, a conviction for this offense lacks the element necessary to satisfy the definition in section 921(a)(33)(A)(ii), even if in a particular case conduct involving force happens to form the basis for proving what is an element—merely that one has "disturb[ed] the peace and quiet" of another. *See also, e.g.*, *Fulford*, 267 F.3d at 1250–51 (rejecting sentence enhancement under statute that required "proof of firearms use as an element of the crime," where prior conviction was for "assault . . . [w]ith a deadly weapon without intent to kill"—not necessarily assault with a firearm) (internal quotation marks omitted).

## II.

The nature of the materials relevant to determining whether a prior conviction satisfies the "misdemeanor crime of domestic violence" definition follows from the statutory terms discussed above. In general, determining the "element[s]" of the "offense" of which a person was "convicted" will depend only on the record of conviction and, as discussed above, the law defining the offense of conviction. The record establishes the offense of which the person was convicted; the law establishes the elements of the offense. Thus, the Seventh Circuit in *Szucz-Toldy*, after first determining that the predicate state offense did not include "as an element" the facts required by the applicable federal law, concluded that an immigration judge "had no reason to look to the indictment and examine the facts alleged there." 400 F.3d at 982. Likewise, the Eleventh Circuit in *Fulford*, affirming a

district court's refusal to consider the allegations in an information, explained that "[t]he phrase 'as an element' only permits an examination of the statute under which the defendant was convicted," and it is therefore improper to "look past the conviction to the charging document." 267 F.3d at 1250, 1251 (internal quotation marks omitted); *see also United States v. Martinez-Mata*, 393 F.3d 625, 628 (5th Cir. 2004) (refusing to consider indictment where statute plainly did not contain requisite element). And in *Taylor*, the Supreme Court recognized that an elements-based "categorical approach" to prior offenses "generally requires the trial court to look only to the fact of conviction and the statutory definition of the prior offense." 495 U.S. at 602; *see also id.* at 600 (describing "formal categorical approach" as allowing resort "only to the statutory definitions of the prior offenses").

One complication arises where the legal definition of a crime can be interpreted to contain a "disjunctive" element—that is, an element with subparts, only one of which must be proved in any particular case—and only the facts specified in some or one of the subparts necessarily includes "the use or attempted use of physical force, or the threatened use of a deadly weapon" as required by the definition of "misdemeanor crime of domestic violence." The firearms prohibition immediately preceding the prohibition at issue here provides an example of a disjunctive element. It generally makes a firearm shipment, transportation, receipt, or possession unlawful for a person:

> (8) who is subject to a court order that—
>
> > (A) was issued after a hearing of which such person received actual notice, and at which such person had an opportunity to participate;
> >
> > (B) restrains such person from harassing, stalking, or threatening an intimate partner of such person or child of such intimate partner or person, or engaging in other conduct that would place an intimate partner in reasonable fear of bodily injury to the partner or child; and
> >
> > (C)(i) includes a finding that such person represents a credible threat to the physical safety of such intimate partner or child; or
> >
> > > (ii) by its terms explicitly prohibits the use, attempted use, or threatened use of physical force against such intimate partner or child that would reasonably be expected to cause bodily injury.

18 U.S.C. § 922(g)(8) (2000). Section 922(g)(8) has three conjunctive subparagraphs—(A), (B), and (C), but the last of these has two clauses. Thus, if subpara-

graphs (A) and (B) "are fulfilled, then by its terms section 922(g)'s firearms disability attaches if *either* clause (C)(i) *or* clause (C)(ii) applies." *United States v. Emerson*, 270 F.3d 203, 213–14 (5th Cir. 2001). The statute has three rather than four elements, *see id.* at 214, and the third element, like the others, must be met in every case, yet it may be satisfied in one of two ways. Where the definition of a crime may be of this sort, the first question will be one of legal interpretation: Is the definition properly read to contain a disjunctive element? In *Szucz-Toldy*, for example, the Seventh Circuit faced a state statute that prohibited "[m]aking a telephone call, whether or not conversation ensues, with intent to abuse, threaten, or harass any person at the called number." 400 F.3d at 979 (internal quotation marks omitted). The court looked to this text and to case law interpreting it, and rejected the view that the statute was "divisible" such that "threaten[ing]" could be an element. *See id.* at 980–81. It was clear under the statute's single offense that "to sustain a conviction . . . it is not necessary to prove the use or threatened use of physical force." *Id.* at 981. Thus, the court's inquiry under a federal statute turning on the elements of the prior conviction was at an end. *See id.* at 982; *cf. Martinez-Mata*, 393 F.3d at 628–29 (addressing argument that statute had disjunctive elements but deciding against government on different grounds); *Calderon-Peña*, 383 F.3d at 258 (discussing statutes that "provide[ ] a list of alternative methods of commission").

Where the legal definition of a crime is interpreted to have such a disjunctive element, it may be argued that a conviction for such a crime never could satisfy the "misdemeanor crime of domestic violence" definition in section 921(a)(33)(A)(ii), because the factual predicate meeting that definition need not be found in *every case* brought under the statute. Under this approach, there never would be occasion to look beyond the record of conviction and legal definition of the crime of conviction. *Cf. Shepard v. United States*, 544 U.S. 13, 30 (2005) (O'Connor, J., dissenting) (discussing *Taylor* and explaining that "[t]he most formalistic approach would have been to find the ACCA requirement satisfied only when the *statute* under which the defendant was convicted was one limited to" an offense containing the requisite elements); *Fulford*, 267 F.3d at 1250 (suggesting that it would be improper to look beyond conviction and definition of offense if statute had disjunctive element).

The language of the "misdemeanor crime of domestic violence" definition does not, however, require such a strict approach. The general definition of "element" does not appear to address this situation, and we see no reason to conclude that a conviction under a crime that contains a disjunctive element, one subpart of which does meet section 921(a)(33)(A)(ii)'s definition, could never be a conviction for an "offense" that contained the required "element." In such a case, the legal definition of the crime at least has an element that includes within it the possibility of the requisite judicial finding. It is true that a court might apply such a law as a single, general offense in which one element could be proved in multiple ways. (In the example of section 922(g)(8) given above, the court might simply instruct the

jury that it needed to find subparagraphs (A), (B), and (C) satisfied, without requiring the jury to specify whether it was finding subparagraph (C)(i) or (C)(ii).) Such a conviction would not satisfy the definition of a "misdemeanor crime of domestic violence." But if, instead, in a particular case the court required the factfinder, in order to convict, to conclude that the subpart of the disjunctive element meeting that definition had been proved (or if it limited a guilty plea in the same way), then it would have applied the law as stating multiple offenses, and the "offense" of which the defendant was actually "convicted" by that court would have been narrowed such that that subpart became, in application, an "element" meeting the definition.

The question, then, will be whether the defendant in fact was convicted under a specific subpart, such that the relevant subpart may be deemed an "element" of his "offense" of conviction. But even when this factual question arises, the actual conduct of the defendant remains irrelevant, as the ultimate question is the same as in the general case: whether the offense of which the person was actually convicted by a court contained an element meeting the required definition. In some cases where a disjunctive element is involved, the record of conviction will provide information sufficient to answer that question. *See*, *e.g.*, *Flores v. Ashcroft*, 350 F.3d 666, 770 (7th Cir. 2003) (where battery statute "separates into distinct subsections the different ways to commit the offense" and defendant pleaded guilty to the "version" in a particular subsection, there was no need to look beyond the record of conviction). But the record of conviction will not always do so, and in such a case other similarly authoritative records of the convicting court will be relevant to the extent—and only to the extent—that they indicate what that court did. Non-judicial documents, such as police reports or other documents supporting charges, will not be relevant in determining whether a defendant actually has been convicted of a specific disjunctive element of an offense.

Our interpretation finds extensive support in the decisions of courts of appeals that have addressed "as an element" language, including one decision doing so in the context of applying the "misdemeanor crime of domestic violence" definition, and in two decisions of the Supreme Court in a similar context. The en banc Fifth Circuit in *Calderon-Peña*, for example, emphasized that "factual material about the method of committing the offense"—whether "alleged in charging papers" or not—"is irrelevant for purposes of" a statute turning on whether a prior conviction had a certain "element." 383 F.3d at 257. Yet it found the following "permissible":

> The sentencing court could look to the indictment or jury instructions for the limited purpose of determining which of a series of disjunctive elements a defendant's conviction satisfies. Under that approach, whenever a statute provides a list of alternative methods of commission . . . we may look to charging papers to see which of the various statutory alternatives are involved in the particular case.

*Id.* at 258 (citation and internal quotation marks omitted); *see id.* n.7 ("our approach has the virtue of respecting the 'as an element' language of the Guideline."). Similarly, the Seventh Circuit has explained that when the statutory definition of a crime contains a disjunctive provision, "it is necessary to look behind the statutory definition," but "the inquiry begins and ends with the elements of the crime." *Flores*, 350 F.3d at 670, 671; *see Szucz-Toldy*, 400 F.3d at 981 (discussing *Flores* and emphasizing "as an element" language); *see also United States v. Kennedy*, 133 F.3d 53, 57–58 (D.C. Cir. 1998) (applying federal statutes turning on the "nature" of prior conviction and whether it had certain facts "as an element," and consulting indictment to determine whether conviction under Hobbs Act had been for robbery or extortion; noting that "a district court may only undertake this inquiry when *a statute provides* for both violent and nonviolent means of violation") (emphasis added).[2]

The Eighth Circuit in *Smith* encountered this situation in the context of the "misdemeanor crime of domestic violence" firearms prohibition. The defendant had pleaded guilty to the crime of "assault," defined as follows:

> A person commits an assault when, without justification, the person does any of the following:
>
> (1) Any act which is intended to cause pain or injury to, or which is intended to result in physical contact which will be insulting or offensive to another. . . .
>
> (2) Any act which is intended to place another in fear of immediate physical contact which will be painful, injurious, insulting, or offensive, coupled with the apparent ability to execute the act. . . .

Iowa Code § 708.1. Subsections (1) and (2) of the assault statute together set out a disjunctive element, and only the first subpart meets the section 921(a)(33)(A)(ii) definition: "[A] generic assault in Iowa may include, as an element, placing another in fear of imminent physical contact. If Smith pleaded guilty to [subsection (2)], then

---

[2] We disagree with the Fourth Circuit's approach in *United States v. Kirksey*, 138 F.3d 120 (4th Cir. 1998), as inconsistent with "as an element" language and with the Supreme Court case law discussed below in this part. Unable to "say categorically that the conduct encompassed in the [elements of the Maryland] crime of battery constitutes the use of physical force against the person of another to the degree required to constitute a crime of violence as used" in the Sentencing Guidelines, the Fourth Circuit resolved the question by consulting the charging documents and concluding, "In the case before us, however, no one disputes that the conduct of Kirksey's prior convictions was violent." *Id.* at 125. The court conflated the facts of the predicate offense *specified by law* (that is, the elements) with the *actual* conduct underlying the conviction for that offense. The law in question appears not to have included a disjunctive element, *see id.*, and thus was like the disturbing the peace example discussed in Part I.

he was not convicted of an offense that 'has, as an element, the use or attempted use of force.'" 171 F.3d at 620 (quoting 18 U.S.C. § 921(a)(33)(A)(ii)).

The court of appeals recognized that it would be proper to look beyond the statute and the record of conviction, but only to determine which of the elements of the offense was proved in support of the defendant's conviction under the statute: "We may expand our inquiry . . . to review the charging papers and jury instructions, if applicable, *only to determine under which portion of the assault statute Smith was convicted*." 171 F.3d at 620–21 (emphasis added). The court looked to the charging papers, which, although not specifying a subsection, did parrot the language of subsection (1), accusing Smith of "an act which was intended to cause pain or injury to another." *Id.* at 621 (internal quotation marks omitted). The court thus concluded that the state had charged him under, and he had pleaded guilty to, subsection (1) rather than subsection (2). It therefore found that he "was charged, and pleaded guilty to, an offense with an element of physical force within the meaning of" the "misdemeanor crime of domestic violence" definition.[3] *Id.*; *see also United States v. Nobriga*, 474 F.3d 561, 564 (9th Cir. 2006) (holding that conviction under statute containing disjunctive element satisfied definition in section 921(a)(33)(A)(ii) because "the charging papers and the judgment of conviction" made clear that the defendant "necessarily pleaded guilty" to the subpart meeting that definition).

Finally, in the *Taylor* and *Shepard* decisions cited above, the Supreme Court applied the same approach in a similar context. Both cases addressed a reference to "burglary" as a predicate conviction in a "three strikes" anti-recidivism provision of the Armed Career Criminal Act ("ACCA"), 18 U.S.C. § 924(e)(2)(B)(ii). In *Taylor*, the Court first concluded that Congress meant "generic burglary" as commonly accepted among the states, and listed the elements of that offense. 495 U.S. at 598. The Court held that a predicate burglary conviction must have been a conviction of a crime (however labeled) having these "basic elements," *id.* at 599, as shown by "the statutory definitions of the prior offenses," not "the particular facts underlying those convictions," *id.* at 600. The provision at issue did not use the phrase "as an element," so it is true that *Taylor* (and *Shepard*) do not directly apply to a statute that, as here, does use that phrase. *See Fulford*, 267 F.3d at 1250. But the Court nevertheless interpreted section 924(e)(2)(B)(ii) as if it required an elements-based approach, including by taking guidance from the appearance of "as an element" in the immediately preceding subsection. 495 U.S. at 600–01; *see also Shepard*, 544 U.S. at 19 (language in the ACCA "imposing the categorical approach . . . refers to

---

[3] In reaching its factual conclusion, the court of appeals followed the reasoning of its earlier decision in *United States v. Taylor*, 932 F.2d 703 (8th Cir. 1991), on remand from the Supreme Court. The *Taylor* court recognized that a guilty plea might not be a plea of guilty to the offense charged, but concluded that the plea should be so considered when there was "no evidence in the record" that a guilty plea "resulted from a plea bargain." *Id.* at 709. (For another of Taylor's prior convictions, there was such evidence, from an order granting probation based on the conviction. *See id.*)

predicate offenses in terms not of prior conduct but of prior 'convictions' and the 'element[s]' of crimes") (quoting *Taylor*, 495 U.S. at 600–01). Thus, like the Eighth Circuit in *Smith* and other courts addressing provisions with "as an element" language, we find *Taylor* (and *Shepard*) instructive.

The relevant question in both *Taylor* and *Shepard* was how one could show a conviction for "generic burglary" when state law defined "burglary" to include actions (such as "burglary" of a vehicle rather than a building) that would not satisfy the Court's generic definition. *Taylor*, 495 U.S. at 599. In both cases, the Court recognized that it may be necessary to look to materials other than the record of conviction, but also recognized that the question remains the *elements* of the offense of conviction—not the defendant's actual conduct—and thus that the universe of documents is a narrow one, consisting of records from the convicting court similar to a record of conviction. *See James v. United States*, 550 U.S. 192, 202 (2007) (stating that under *Taylor* and *Shepard* the Court "consider[s] whether the *elements of the offense* are of the type that would justify its inclusion" in section 924(e)(2)(B)(ii) "without inquiring into the specific conduct of th[e] particular offender"); *id.* at 217 (Scalia, J., dissenting) (agreeing "with this approach").

The Court in *Taylor*, addressing cases tried to a jury, concluded that the "categorical approach" would allow a court "to go beyond the mere fact of conviction in a narrow range of cases where a jury was *actually required to find* all *the elements* of generic burglary." 495 U.S. at 602 (emphases added). The question is what "the jury *necessarily had to find*," and "the indictment or information and jury instructions" together might well answer that question. *Id.* (emphasis added); *see id.* (holding that prior burglary conviction satisfies ACCA if "the charging paper and jury instructions *actually required the jury to find* all *the elements* of generic burglary in order to convict the defendant") (emphases added); *Shepard*, 544 U.S. at 17 (reiterating this language of *Taylor*); *id.* at 20 (describing *Taylor* as allowing reference only to "charging documents filed in the court of conviction, or to recorded judicial acts of that court limiting convictions to the generic category," such as jury instructions).

In *Shepard*, the Court reaffirmed *Taylor* and considered what would be "adequate judicial record evidence," 544 U.S. at 20, where a prior conviction under a statute defining burglary to include breaking and entering "a building, ship, vessel or vehicle," Mass. Gen. Laws Ann. ch. 266, § 16A (West 2000), did not rest on a jury verdict. The Court concluded that "the closest analogs to jury instructions would be a bench-trial judge's formal rulings of law and findings of fact, and in pleaded cases they would be the statement of factual basis for the charge . . . shown by a transcript of a plea colloquy or by written plea agreement presented to the court, or by a record of comparable findings of fact adopted by the defendant upon entering the plea." 544 U.S. at 20; *see id.* at 26 (for guilty plea, inquiry "is limited to the terms of the charging document, the terms of a plea agreement or

transcript of colloquy between judge and defendant in which the factual basis for the plea was confirmed by the defendant, or to some comparable judicial record of this information"). Such materials meet the categorical standard of *Taylor* as "*conclusive records* made or used in adjudicating guilt." *Id.* at 21 (emphasis added). The Court rejected the government's arguments that complaint applications or materials accompanying them (such as police reports) could be relevant. *Id.* at 21–22.

The Supreme Court in *Shepard* also necessarily rejected a series of decisions from the First Circuit, including the decision below, 348 F.3d 308, 312–13 (1st Cir. 2003), that, while purporting to follow the rule of *Taylor*, had nevertheless considered actual conduct relevant to determining the elements of the offense of conviction. In *United States v. Harris*, 964 F.2d 1234 (1st Cir. 1992), for example, the First Circuit had reasoned that, if the indictment simply charged a violation of a burglary statute, without further detail or with ambiguous boilerplate, and the defendant pleaded guilty, such that no jury instructions existed, then "the conduct in respect to which the defendant was charged and pled guilty . . . may indicate that the defendant and the government both believed that the generically violent crime ('building'), rather than the generically non-violent crime ('vehicle') was at issue." *Id.* at 1236; *see also Shepard*, 544 U.S. at 18 (noting view of First Circuit below that police reports could be "'sufficiently reliable evidence'" of elements included in guilty plea).

Determining the "element[s]" of the "offense" of which a person was "convicted" by a court requires, in the words of both *Shepard* and *Taylor* quoted above, and consistent with the definition of "element," evidence of the facts specified by law that were "necessarily" found or "actually required" to be found by the convicting court. Neither the subjective "belie[fs]" of the government and defendant, *see Harris*, 964 F.2d at 1236, nor the actual conduct of the defendant is relevant to this determination. The question is what the convicting *court* objectively did. With regard to police reports, there is no necessary correlation between the alleged actual conduct reported by the police and the legally specified facts required to be found by the convicting court (even if a police report becomes attached to a charging document), at least absent a court having in some way adopted such a report so as to make it a "conclusive[] record" of the facts judicially found "in adjudicating guilt." *Shepard*, 544 U.S. at 21; *see id.* at 20, 26. Indeed, a record of such alleged conduct may be misleading. It may be that not all of the crimes that the defendant arguably committed through his conduct were charged, or that not all of the charges led to convictions, or both. *See, e.g.*, *Kirksey*, 138 F.3d at 122–23. A police report may be particularly misleading in the context of a plea agreement, given that the government may forgo prosecuting certain charged offenses in exchange for a guilty plea to a lesser offense. The Court in *Taylor* noted a similar risk in support of its "categorical approach" to burglary. 495 U.S. at 601–02 (noting possibility of "a guilty plea to a lesser, nonburglary offense" as "the result of a plea bargain" and risk of erroneously imposing a sentence en-

hancement "as if the defendant had pleaded guilty to burglary"). Thus, where a statute genuinely has a disjunctive element, creating a factual question regarding the elements of the actual offense of conviction, only records from the convicting court—"conclusive records made or used in adjudicating guilt," *Shepard*, 544 U.S. at 21—will in fact reliably indicate whether the particular offense of conviction included an element meeting the definition of a "misdemeanor crime of domestic violence" in section 921(a)(33)(A)(ii).[4]

## III.

Our conclusions regarding the plain meaning of the section 921(a)(33)(A)(ii) definition and the materials that are, as a consequence, relevant to whether a convicting court found elements satisfying that definition apply equally to a determination by the FBI, in implementing the NICS, of whether a person's receipt of a firearm would violate federal law. That conclusion, however, does not mean that non-judicial materials such as police reports are of no use for the work of the NICS.

The Brady Handgun Violence Prevention Act ("Brady Act") required the Attorney General to "establish a national instant criminal background check system that any licensee may contact . . . for information, to be supplied immediately, on whether receipt of a firearm by a prospective transferee would violate [certain federal laws, including 18 U.S.C. § 922(g)(9)] or State law." Pub. L. No. 103-159, § 103(b), 107 Stat. 1536, 1541 (1993). The Attorney General has fulfilled this mandate by establishing and maintaining the NICS within the FBI. *See* 28 C.F.R. §§ 25.1 & 25.3 (2006).

---

[4] We are aware of a statement on the Senate floor regarding the section 922(g)(9) prohibition that might be read to support a view that the prohibition should apply to convictions for offenses that do not include as an element the use or attempted use of physical force, or the threatened use of a deadly weapon. *See* 142 Cong. Rec. 26,675 (1996) (statement of Sen. Lautenberg, urging "law enforcement authorities to thoroughly investigate misdemeanor convictions on an applicant's criminal record to ensure that none involves domestic violence, before allowing the sale of a handgun."). To the extent that the statement can be so read, it does not control the question before us. First, legislative history has no place where, as here, the relevant statutory text is unambiguous. *See, e.g.*, *Dep't of Housing & Urban Dev. v. Rucker*, 535 U.S. 125, 132 (2002) ("[R]eference to legislative history is inappropriate when the text of the statute is unambiguous."); *Davis v. Mich. Dep't of Treasury*, 489 U.S. 803, 808 n.3 (1989) ("Legislative history is irrelevant to the interpretation of an unambiguous statute."). Second, the final language defining a "misdemeanor crime of domestic violence" was a compromise between Senator Lautenberg and senators concerned with the breadth of his initial bill, which lacked the "as an element" language. *Compare* 142 Cong. Rec. 5840 (1996) (initial bill) *with id.* at 26,674–76 (discussing compromise). Reliance on a floor statement in such a case would give members of Congress "both the power and the incentive to attempt strategic manipulations of legislative history to secure results they were unable to achieve through the statutory text." *Exxon Mobil Corp. v. Allapattah Serv., Inc.*, 545 U.S. 546, 568 (2005). Legislation invariably "reflects compromise among competing interests," *Heath v. Varity Corp.*, 71 F.3d 256, 258 (7th Cir. 1995), and our task is simply to give effect to that compromise—as memorialized in "the language actually voted on by Congress and signed into law by the President," *Regan v. Wald*, 468 U.S. 222, 237 (1984).

Another section of the Brady Act (section 102(b), codified at 18 U.S.C. § 922(t)(1)), requires federally licensed firearms dealers ("licensees") in most cases to contact the NICS before selling a firearm to a person. Upon receiving an inquiry, the NICS checks certain databases and in the ordinary course immediately responds with one of two determinations: "proceed," which indicates that the transfer is allowed, or "denied," which indicates that the transfer is not allowed. *See* 28 C.F.R. §§ 25.2 & 25.6(c)(1) (2006); *see also National Instant Criminal Background Check System Regulation*, 69 Fed. Reg. 43,892, 43,897 (July 23, 2004) (discussing high rate of immediate or nearly immediate responses). If the NICS is unable to determine immediately whether or not the transaction may proceed, it issues a "delayed" response, and the inquiry remains "open." *See* 28 C.F.R. §§ 25.2 & 25.6(c)(1). Such a response temporarily prohibits the transfer and indicates that the NICS has found "a record that requires more research to determine whether the prospective transferee is disqualified from possessing a firearm." *Id.* § 25.6(c)(1)(iv)(B). The NICS "continues researching potentially prohibiting records" in an effort to obtain "definitive information." *Id.* § 25.2 (defining "Open"). If the NICS is unable to issue a denial within three business days, the restriction on transfer by the licensee expires. 18 U.S.C. § 922(t)(1)(B)(ii). The NICS may, however, continue to investigate the transferee, for up to 90 days under current regulations. *See* 28 C.F.R. § 25.9(b)(1)(ii) (2006) (providing for destroying audit-log records regarding an open inquiry within 90 days of the inquiry). If it subsequently determines that the receipt of the firearm was unlawful, the NICS issues a "delayed denial." In such a case, the FBI will notify the ATF, *see id.* § 25.9(b)(2)(i), which may take action against the transferee.

The Brady Act authorizes the NICS to issue a denial only if it has concluded "that the receipt of a firearm" by the prospective transferee "*would violate*" federal or state law. 18 U.S.C. § 922(t)(1)(B)(ii) (emphasis added); *see id.* § 922(t)(5) (addressing licensee's failure to contact the NICS when the NICS "was operating and information was available to the system demonstrating that receipt would violate" federal or state law); Brady Act § 103(b) (requiring NICS to provide information "on whether receipt of a firearm by a prospective transferee would violate" federal or state law). Alternatively, the NICS must issue a "proceed" if it has concluded that such receipt "would *not* violate" federal or state law. 18 U.S.C. § 922(t)(2) (emphasis added). In addition, it may issue a "proceed" in cases in which it is not authorized to issue a denial (and decides that a "delayed" response is not warranted), given that in such case there is no statutory authorization for a denial. *See id.* § 922(t)(4) (referring to the issuance by NICS of a "proceed" if "the information available to the system *does not demonstrate* that the receipt of a firearm by such other person would be" unlawful) (emphasis added).

Our analyses above in Parts I and II establish the statutory rule and relevant category of materials for determining that a transfer "would violate" the prohibition set out in sections 921(a)(33)(A)(ii) and 922(g)(9) regarding misdemeanor

crimes of domestic violence. Because the NICS must determine whether a firearm transaction "would violate" section 922(g), the legal and factual questions for the NICS are the same as those for determining whether that prohibition applies in a judicial setting, regardless of the standard of proof applicable to the NICS (a question we have no occasion to address). If the legal definition of the crime of conviction (whether found in a statute or case law) unambiguously includes (or omits) an element involving "the use or attempted use of physical force, or the threatened use of a deadly weapon," *id.* § 921(a)(33)(A)(ii), then that definition and the record of conviction suffice. If such an element is included, a denial is appropriate; if such an element is omitted, a "proceed" is appropriate, barring any other bases under federal law for a denial. In neither scenario are the facts of the defendant's underlying conduct relevant.[5]

If the legal definition of the crime specified in the record of conviction contains a disjunctive element, thus creating a factual question about the precise offense of conviction, as described above in Part II, then judicial documents of the sort discussed in Part II are relevant as the NICS seeks to determine whether the court, in convicting, was "actually required to find," *Taylor*, 495 U.S. at 602, the subpart of the disjunctive element that meets the section 921(a)(33)(A)(ii) definition. If such documents are not already in the system, a "delayed" response putting the inquiry into open status would be appropriate. But even where the statute allows for multiple offenses and the record of conviction is inconclusive, police reports and similar materials may not establish the basis for a denial. For the reasons discussed in Part II, such materials are not probative of whether a transfer "would violate" the section 922(g)(9) prohibition because the transferee had a prior "convict[ion]" for an "offense" containing a particular "element[]."

We understand from the FBI, however, that NICS practice with regard to statutes containing a disjunctive element has not been consistent with this interpretation and, in particular, that it has included reliance on police reports to justify denials based on the elements of a prior conviction. *See* FBI Views Letter, *supra* note 5, at 1–2. The FBI has expressly relied on the erroneous reasoning of the First Circuit in *Shepard* that even if actual conduct is not technically relevant, a police report may be a generally reliable indicator to "inform the determination regarding the prong of the statute under which the defendant pled or was otherwise convicted." FBI Views Letter at 4; *see id.* at 2. As explained in Part II, such an approach is inconsistent with the statute and relevant case law.

---

[5] The FBI has informed us that its practice in such cases is consistent with this interpretation. *See* Letter for Jay Bybee, Assistant Attorney General, Office of Legal Counsel, from Larry R. Parkinson, General Counsel, FBI, *Re: Treasury Department Request for Opinion Regarding Misdemeanor Crimes of Domestic Violence* at 3 (Mar. 6, 2002) ("FBI Views Letter") ("NICS has always maintained that . . . the statute at issue *must contain the 'use of force' element* (whether in the alternative or not). Only if the statute contains such an element will NICS proceed with its investigation.") (emphasis added). The denial at issue in *Kneifl*, however, a case cited above in Part I, appears inconsistent with this practice, as the Nebraska statute unambiguously did not include such an element.

Nor does the Brady Act allow the NICS to adopt some lesser standard that might justify reliance on police reports. *See* FBI Views Letter at 3. Section 922(t)(1)(B)(ii) provides that the NICS, to justify a denial, must conclude that the transfer "*would* violate" federal or state law. (Emphasis added.) Section 922(t)(5) likewise refers to "information . . . demonstrating that receipt . . . *would* violate" federal or state law. (Emphasis added.) This language is not ambiguous. The information that the NICS possesses must demonstrate a violation; in the case of section 922(g)(9), this requires information demonstrating a prior conviction in which the factfinder necessarily found the *element* required for a misdemeanor crime of domestic violence. (This standard does not mean, however, that the NICS must negate grounds for the prohibition not to apply, any more than a prosecutor must disprove affirmative defenses.) Our discussion in Part II establishes what information is relevant in making such a demonstration. In the absence of such information, there is no statutory authority for the NICS to issue a denial under section 922(g)(9).[6]

We recognize the practical difficulties that the "misdemeanor crime of domestic violence" definition and the limits of the statutory authority of the NICS may present, particularly as the NICS strives to make a determination under the time constraint that the Brady Act imposes. The FBI has explained that the NICS "operates in an environment different from that of ATF" and that, for misdemeanor convictions, "often the only relevant documents available within the three day time frame are the record of conviction and the police report on the underlying incident that led to the conviction." FBI Views Letter at 3; *see id.* at 5 (similar). But the FBI's approach creates "practical difficulties and potential unfairness" of its own, *see Taylor*, 495 U.S. at 601–02, and, in any event, the difficulties the FBI has identified do not allow us to disregard what the statute requires. We must reject the FBI's argument just as the Supreme Court in *Shepard* rejected the government's argument based on "the happenstance of state court record-keeping practices and the vagaries of state prosecutors' charging practices." 544 U.S. at 22 (internal quotation marks omitted).

A police report or similar document may, however, in a particular case assist the NICS in deciding to delay its response to a NICS inquiry and investigate further pursuant to its procedures for open inquiries. The implementing regulations require a "proceed" response "if *no* disqualifying information was found." 28 C.F.R. § 25.6(c)(1)(iv)(A) (emphasis added). Yet if, as we understand is often the case, the NICS is presented with a legal definition of a crime that at least has a disjunctive element including a subpart that meets the "misdemeanor crime of

---

[6] Consistent with the statutory requirement, the NICS regulations likewise provide that a denial should issue only when the NICS has "information demonstrating that receipt of a firearm by the prospective transferee would violate 18 U.S.C. § 922 or state law." 28 C.F.R. § 25.6(c)(1)(C); *see also id.* § 25.2 (defining "Open" status as the period in which the NICS researches "potentially prohibiting records" for "definitive information").

domestic violence" definition, and with a record of conviction that does not specify under which subpart the defendant was convicted, then the NICS does have information indicating the possibility of a disqualification, even if not enough to justify a denial. The NICS might *decline* to conclude that the transfer "would *not* violate" the law. A "delayed" response, rather than an immediate "proceed," would allow the NICS three days in which to pursue the matter before a transfer occurred. *See id.* § 25.6(c)(1)(iv)(B) (explaining that delay indicates that the NICS has found "a record that requires more research to determine whether the prospective transferee is disqualified from possessing a firearm"). And given the limited time and resources available to the NICS, a police report or similar record demonstrating alleged conduct that, if charged and proved, might have justified a conviction under the requisite subpart, may be useful for narrowing the field of candidates on which the NICS will conduct more detailed background checks. Even if it could not reach a resolution within the three-day period, and the transfer were allowed pursuant to the statutory requirement, the NICS could continue to investigate and, if appropriate, issue a delayed denial and refer the matter to the ATF. Similar reasoning could apply if a prior conviction involved a statutory crime, not familiar to the NICS, that was stated in general terms drawing on the common law. A police report may assist the NICS in determining whether research into the case law defining the elements of the crime is likely to be worthwhile.

C. KEVIN MARSHALL
*Deputy Assistant Attorney General*
*Office of Legal Counsel*